**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

SHAKIA L. BAILEY, ADMINISTRATOR
OF THE ESTATE OF JAQARIS A. JEMISON,
DECEASED,

      Plaintiff,

v.                                                                                   Case No. _____

AXEL M. ALBERTORIO-RUIZ,                                          **JURY TRIAL DEMANDED**

      Serve at:

      ██████████████████
      Newport News, VA ████

AMBER M. HOGGE,

PETERSON (Deputy, or Employee of, Newport
News Sheriff's Office),

VERMEL CARLSON,

      Serve Defendants Hogge, Peterson,
      and Carlson at:

      Newport News Sheriff's Office
      224 26th St.
      Newport News, VA 23607-4406

JOHN DOE DEPUTIES 1-5 (Deputies, Employees, and Agents
of the Newport News Sheriff's Office, Newport News
City Jail, and/or Sheriff Morgan),

      Defendants.

## COMPLAINT

      COMES NOW Plaintiff Shakia L. Bailey, Administrator of the Estate of Jaqaris A.

Jemison, Deceased (Plaintiff's decedent is referred to as "Jaqaris"), by counsel, and moves this

Court for judgment against Defendants Axel M. Albertorio-Ruiz, Amber M. Hogge, Peterson (Deputy, or Employee of, Newport News Sheriff's Office), Vermel Carlson, John Doe Deputies 1-5 (Deputies, Employees, and/or Agents of the Newport News Sheriff's Office, Newport News City Jail, and/or Sheriff Morgan), and, in support thereof, states as follows:

## SUMMARY

1.      Jaqaris Jemison, a young man with a history of mental illness, hanged himself after he was placed in "the hole"—segregated housing—at the Newport News City Jail ("Jail"), bullied by other detainees, and ignored by the deputies/employees (Defendants herein) working there. Jaqaris was flagged for suicide watch when he first entered the Jail and his long history of mental illness was well known. Despite that, a few weeks after entering the Jail, Jaqaris was placed alone in the hole as a form of punishment. Approximately eight days later, he hanged himself from a bedsheet.

2.      On the last night of his life, Jaqaris spoke to his mother, Plaintiff Shakia Bailey, by phone. During the call, he made suicidal statements. Soon after, Ms. Bailey received a call from another detainee threatening Jaqaris and his family. Ms. Bailey then immediately called the Jail to warn them. The deputy she spoke with said she would tell the watch commander and assured her that Jaqaris would be safe, that deputies checked on him every 15 minutes.

3.      But no deputy took action in response to Ms. Bailey's call. Meanwhile, Jaqaris took his own life approximately 20 minutes after Ms. Bailey called the Jail and pleaded for someone to check on her son.

4.      Jaqaris was hanging for approximately 56 minutes before any deputy noticed. By that time, no one had rounded on Jaqaris's cell for 1 hour and 56 minutes. Even when a detainee

2

exclaimed that Jaqaris was hanging by his neck from a bedsheet and began yelling for help, joined by other detainees, deputies/employees did not respond.

5. When a deputy finally responded to the desperate calls and took Jaqaris down, it was too late. By the time EMS arrived, Jaqaris was not breathing and had no pulse. He was transported to the hospital, where he was pronounced deceased. Jaqaris Jemison was 21 years old. The extreme indifference, gross incompetence, and lack of care demonstrated by the Newport News Sheriff and his deputies/employees at the Jail caused Jaqaris's death.

## JURISDICTION

6. Jurisdiction exists in this case pursuant to the Fourteenth Amendment of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343. Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims, including claims alleged pursuant to Virginia Code § 8.01-50 *et seq*. (wrongful-death statute), or, alternatively, pursuant to Virginia Code § 8.01-25 *et seq*. (survival statute). All relief available under the foregoing statutes is sought herein by Plaintiff.

## VENUE

7. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this district.

8. Assignment to the Newport News Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rule 3(b), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## PARTIES

9.      Plaintiff SHAKIA L. BAILEY is the ADMINISTRATOR OF THE ESTATE OF JAQARIS A. JEMISON, DECEASED, who died on June 17, 2025. The Plaintiff is presently, and was at all relevant times, a resident of the Commonwealth of Virginia. Plaintiff duly qualified as the Administrator of the Estate of Jaqaris A. Jemison on August 18, 2025 in the Circuit Court for the City of Newport News. A copy of the Certificate/Letter of Qualification is attached hereto, marked as **Exhibit A**. Plaintiff brings this action pursuant to 42 U.S. Code §§ 1983 and 1988 and Virginia Code § 8.01-50 *et seq*. (the wrongful death statute). All relief available under the statute is sought herein by Plaintiff.

10.      At all times relevant hereto, Defendants AXEL M. ALBERTORIO-RUIZ, AMBER M. HOGGE, PETERSON, VERMEL CARLSON, and JOHN DOE DEPUTIES 1-5 were deputies, employees, and/or agents of the Newport News Sheriff's Office, Newport News City Jail, and/or Sheriff Morgan.[1] The foregoing deputies/employees were duly appointed and acting deputies and employees of Sheriff Morgan, and were agents and employees of the Sheriff's Office, acting, at all relevant times, within the scope of their employment and under color of state law. The foregoing deputies/employees are sued in their individual capacities.

a.      Defendant Albertorio-Ruiz was assigned to round and observe Jaqaris and other detainees/prisoners in the "hole" on June 17, 2025. Not only did he not conduct rounds, he initially ignored prisoners' calls for help. He then lied regarding his actions and the circumstances.

---

[1] At all relevant times, Gabriel A. "Gabe" Morgan, Sr. was the duly elected Sheriff of the City of Newport News. Sheriff Morgan is a constitutional officer independent of the City of Newport News. (All references herein to the "Sheriff's Office" are to the Sheriff, the elected constitutional officer under the Constitution of Virginia.)

4

Defendant Albertorio-Ruiz's full given name is Axel Manu Albertorio-Ruiz. He was terminated by the Newport News Sheriff's Office on June 18, 2025—the day after Jaqaris's death—and was decertified as a jail officer by the Virginia Department of Criminal Justice Services on July 28, 2025.

b.      Defendant Hogge answered Ms. Bailey's telephone call to the Jail on June 17, 2025, described below. Defendant Hogge assured Ms. Bailey that her son would be safe and that she would notify the on-duty watch commander of Ms. Bailey's concerns. However, she did not notify anyone; she said that she merely left out a sticky note to be picked up by booking.

c.      According to Deputy Hogge, Defendant Peterson picked up the note within the hour and took it to Lieutenant Carlson.

d.      Defendant Carlson was the lieutenant on duty who never responded to Ms. Bailey's urgent call for help for her son.

e.      John Doe Deputies 1-5 were on duty at the Jail on June 17, 2025 and were responsible for the care and supervision of Jaqaris. Deputies 1-5 were present while Jaqaris exhibited signs that he was in need of medical treatment and suicide watch, and/or when Jaqaris engaged in his suicide preparations, and/or when Jaqaris was denied the necessary medical and psychological treatment described herein, yet no Deputy took appropriate action. Plaintiff alleges, on information and belief, that each of them is responsible for Jaqaris's death.

## FACTS

### April 10, 2025

11.     Jaqaris, 21 years old, was detained at the Jail on or around April 10, 2025.

12.     Preceding his arrival, at the time of his arrival, and during his subsequent detention

5

at the Jail, Jaqaris experienced and exhibited symptoms of serious mental health problems, including hearing and responding to voices.

a.    At age 14, Jaqaris was severely injured in a car accident, resulting in extreme blood loss to his brain. The treating doctor told Ms. Bailey that the injury could result in mental health problems as Jaqaris grew older.

b.    Starting around age 20, Jaqaris began showing serious symptoms of mental illness.

13.    On April 10, 2025, Ms. Bailey contacted the police for help after Jaqaris was acting strangely.[2] He was arrested, then taken to the emergency room at Riverside Regional Medical Center for medical clearance. There, Jaqaris was diagnosed with acute psychosis, suicidal ideation, and hallucinations. The registered nurse and psychiatric tech on duty were then "notified by officers that CSB [Community Services Board] [is] to evaluate patient in police custody in jail for psychiatric placement." Jaqaris was discharged into the custody of the Newport News Police Department and transported to the Jail.

14.    The Defendants were aware of Jaqaris's mental health issues and his need for close supervision and monitoring. According to Jail records during the booking process, Jaqaris was noted as a "High Risk Inmate" and "REPORTED RECENT HISTORY OF SUICIDAL AND HOMICIDAL IDEATION." "Yellow flag precautions" were initiated.

15.    At intake on April 11, 2025, Intake Nurse Misty Rendel observed injuries to Jaqaris's wrists and hands. Jaqaris told Nurse Rendel he caused those injuries when he slipped out of handcuffs. Jaqaris further reported that he had attempted suicide less than a year before by

---

[2] Once Jaqaris turned 18, there were limited intervention options for Ms. Bailey.

6

jumping off an overpass, and that he was under the influence of mushrooms at the time of his arrest. At the conclusion of the screening, Nurse Rendel placed Jaqaris on suicide watch and submitted an emergency referral to behavioral health.

16.     Jaqaris was noted to be "Dangerous to Self (threat/action)" and was initially placed on suicide precautions, also known as suicide watch. He continued days later to state that he had suicidal thoughts and continued to suffer from delusional thinking, including hearing voices. However, he was subsequently removed from suicide precautions/watch on April 18, 2025.

17.     There are no documented medical or psychiatric examinations of Jaqaris in May or June 2025 leading up to his death. The only medical examinations Jaqaris received during his entire incarceration were related to the wounds on his hands and wrists, and that limited care was provided only between approximately April 14 and April 25, 2025. Throughout his more than two months of detention, Jaqaris was administered only one medication—cephalexin 500 mg, an antibiotic used to treat bacterial infections. Despite his documented serious mental illness, acute psychosis, suicidal history, and his disclosure that he had stopped taking his psychotropic medications, Jaqaris was not treated with any psychiatric medication while in the Jail's custody.

18.     Ms. Bailey struggled to speak directly with Jaqaris while he was incarcerated. She called deputies at the Jail several times to check on her son. At one point, she spoke to a deputy who told her the deputies were aware that Jaqaris was mentally ill and that was why his phone calls were restricted. In another call, a deputy told Ms. Bailey that Jaqaris was being kept in a "turtle suit" (a smock designed so a person may not use their clothing to hang themself).

7

19.    At some point before June 17, 2025, Jaqaris was able to reach Ms. Bailey by having another detainee call her. Jaqaris told his mother, "I'm okay. They got me in a turtle suit. I love you all."

## June 17, 2025

### The First Call

20.    On the evening of June 17, 2025, Terie "Haiti" Bynum, Ms. Bailey's long-time boyfriend, received a call from a detainee at the Jail. The detainee is referred to herein as "Caller."

21.    Ms. Bailey, who was standing next to Mr. Bynum and joined the call, realized that her son, Jaqaris, was either not allowed or unable to call, and that the Caller was calling to inform her and Mr. Bynum about Jaqaris's condition. During the call, Ms. Bailey could barely hear her son's voice in the background at the Jail. The Caller repeated Jaqaris's statements to her, as well as her statements to Jaqaris.

22.    After Mr. Bynum confirmed with the Caller that he was Jaqaris's (de facto) father, Jaqaris asked the Caller to relay to Bynum that he loves him.

23.    Ms. Bailey asked the Caller to ask Jaqaris if he received "the canteen" they just sent (commissary funds), and to ask if he needed anything in particular. She then told the Caller to tell Jaqaris that she loves him.

24.    Ms. Bailey asked why Jaqaris did not have a tablet he could use to communicate directly with her and Mr. Bynum. The Caller said, "he can't get the tablet right now."

25.    She then asked if her son was still in a "turtle suit."

26.    The Caller replied that Jaqaris was no longer in a turtle suit, but remained mentally unstable, saying, "he's definitely crazy."

8

27.    Ms. Bailey asked if there was anything Jaqaris wanted her to know. The caller replied, Jaqaris "said that he loves you to his death."

28.    Ms. Bailey replied, "Tell him don't say to his death. 'Cause he better not fold."

29.    The Caller said that Jaqaris was confused as to who was on the line.  The Caller can be heard saying, "she just told you," and then commenting to Ms. Bailey, "[he's] crazy."

30.    Thereafter, Mr. Bynum asked how Jaqaris was holding up. The Caller said, "he loves you," then added, "he says he's not doing so well."

31.    Mr. Bynum responded, "Okay, ask him what does he need to do so well, because he's about to come home."

32.    Jaqaris questioned if he would.

33.    Ms. Bailey said to ask Jaqaris, "Haven't we always been there for you and done what we said we would do?"

34.    The Caller then said that Jaqaris was crazy and wanted to verify their identities again by asking about his grandmother's name, which Ms. Bailey provided. The Caller then conveyed that Jaqaris said, "He loves you with his soul, swear to God."

35.    The Caller said that Jaqaris "says he is on the verge, he's on the edge."

36.    Deeply disturbed by the statement, Ms. Bailey responded, "No, tell him we know what we're doing, he got to calm down. He has a court date next week [...]. The world ain't over, we know what we're doing."

37.    Ms. Bailey said, "all this requires is for him to be patient, we know what we're doing."

38.    The Caller told Ms. Bailey that Jaqaris was in the cell by himself.

39. The Caller said, "Jaqaris asks you what you want him to do. Do you all do you want him to stay or do you want him to go?"

40. Ms. Bailey asked, "stay where?"

41. Mr. Bynum observed to her, "in the hole or population."

42. The Caller clarified with Jaqaris what he meant and observed, "he actin' crazy," then added that Jaqaris meant, "if you want him to live or or if you want him to die."

43. Ms. Bailey quickly responded, "He's part of Team Five. Why would he ever fold?" "Team Five" referred to Ms. Bailey and her four children, and to their collective commitment to standing up to challenges.

44. She told the Caller, "I told him that when he was little. Tell him this is one of those moments he has to push through and remind him that we are Team Five."

45. Ms. Bailey implored Jaqaris to be patient and told him that someday this would be something they would sit down and laugh about.

46. Mr. Bynum also reminded Jaqaris that he's his son and that he has great internal strength.

47. The Caller said, "he said that he loves you to the end."

48. Mr. Bynum observed, "we love you to the beginning."

49. Ms. Bailey said that Jaqaris had to "be patient."

50. The above illustrates that Jaqaris was of unsound mind when he took his own life and in the period preceding his death.

## The Second Call

51. Approximately a minute later, an inmate called back. It was a remarkably different

10

call from the preceding call.

52.    In the second call, the caller (Second Caller), who is believed to be a different individual who overheard the original call, was immediately angry. After Ms. Bailey answered, he said, "We gon' beat the shit out of your son," and insulted Haiti. The Second Caller yelled, "we gon' fix your son when he come out" and "we smokin' his grandmama." The Second Caller then hung up.

53.    Ms. Bailey and Mr. Bynum never learned what caused the dramatic change in circumstances. They tried to process what they had heard.

Ms. Bailey's Call to the Jail

54.    Ms. Bailey told Mr. Bynum, and then her daughter Janiya, "I want to call down there. Jaq doesn't sound right. He's going to do something to himself," or words to that effect.

55.    Around 9:36 p.m., Ms. Bailey called the Jail and told the deputy who answered that she had just received a disturbing call regarding her son and that he was being threatened. Defendant Amber M. Hogge answered the call. Ms. Bailey emphatically conveyed that her son was in danger and someone needed to check on him. Sheriff's deputies could have reviewed the calls to Mr. Bynum and Ms. Bailey, but apparently did not do so until review was requested in this lawsuit.

56.    Defendant Hogge stated she would inform her watch commander about Ms. Bailey's calls and her concerns, and she assured that Jaqaris would be safe. She mentioned there were cameras "back there" where Jaqaris was being held. She also explained that since Jaqaris was suicidal, his cell door did not face any other detainee or inmate. Additionally, she said that deputies checked on Jaqaris every 15 minutes.

11

57. Defendant Hogge took Ms. Bailey's number, but no one from the Jail or Sheriff's Office called her back. The next call she got from the Jail was to inform her that her son was dead. No deputy took any action in response to Ms. Bailey's phone call alerting them to the emergency situation. Jaqaris undertook to hang himself approximately 20 minutes after Ms. Bailey called the Jail and pleaded for someone to check on her son.

58. According to a written statement drafted the following day, Defendant Hogge admits receiving a call from Ms. Bailey on June 17 (but incorrectly noted the time of the call). Defendant Hogge further admits that Ms. Bailey stated an inmate in her son's block called her back after she finished a phone call with her son, Jaqaris. According to Hogge, Ms. Bailey said that the caller "made threatening remarks toward her son and herself." Defendant Hogge states that she "wrote this down on a sticky note and left it on the printer to be picked up by booking." She "believe[s]" the note was "picked up within the hour."

59. Deputy Hogge further states, "Deputy Peterson took it into booking with her stating that she would let Lt. Carlson know as soon as she returned."

60. Near or before this time, other detainees were encouraging Jaqaris to hang himself. No deputies intervened to protect the mentally fragile Jaqaris.

61. Scott Michael Rogers was held in an adjacent cell to Jaqaris. He heard noise from Jaqaris speaking to his family. Then he heard Jaqaris grow quiet some time after the call ended. After a period of silence, Rogers held out his tablet outside his cell to see Jaqaris's cell in the reflection on the screen.

62. He saw Jaqaris hanging.

12

63.     He, and then several other detainees, began yelling for help. Those cries would persist for what Rogers described as what felt like 45 minutes.

64.     At one point, upon information and belief, Defendant Albertorio-Ruiz finally yelled back. Rogers explained that Jaqaris was hanging. Appallingly, Defendant Albertorio-Ruiz said he would respond after finishing his current task. When he eventually came to the hole, at approximately 10:50 p.m., he found Jaqaris hanging from a bedsheet tied to the cell's bars and summoned help. Deputies used shears to cut Jaqaris down from the bedsheet.

65.     EMS was notified at approximately 10:54 p.m.

66.     According to Defendant Albertorio-Ruiz, nurses from the Jail, Nurses K. Green and Lynch "later" arrived.

67.     Defendant Albertorio-Ruiz drafted an official statement asserting that when an inmate advised him that there was an inmate "TRYING TO COMMIT SUICIDE," he "RUSHED" to find "INMATE JEMISON SUSPENDED IN HIS CELL TRYING TO HANG HIMSELF."

68.     However, a written statement from Nurse Lynch demonstrates this to be false. Lynch recorded, "pt [patient] skin cold to touch, could not assess/feel a carotid pulse, rigor mortis appeared to be setting in to pt's jaw."

69.     The internal investigation that followed Jaqaris's death confirmed that Defendant Albertorio-Ruiz's account was false. During an investigation interview on June 18, 2025, Albertorio-Ruiz initially told Newport News Sheriff's Office Lieutenant Hirst that he had completed his security rounds every 30 minutes at random times and that he had also completed the rounds for inmates on 15-minute watch. He falsely claimed he had last observed Jaqaris alive during his "2210 hour" (10:10 p.m.) round and described walking past each cell to check for signs

13

of life. After Lieutenant Hirst reminded him that there were cameras throughout the Jail, Albertorio-Ruiz reversed course, admitting he had not conducted proper security rounds and had not completed all the security checks he had documented. Albertorio-Ruiz further admitted he had lied during a prior interview with Newport News Police Department Homicide Detective McKinley and to Internal Affairs.

70. Although Albertorio-Ruiz documented completed security rounds at 2005, 2034, 2118, 2152, 2210, and 2253 hours, the last security round that investigators were able to verify by video footage was at 2056 hours. Albertorio-Ruiz did not complete any security rounds between 2056 and 2210 hours. At 2210 hours, Albertorio-Ruiz walked to the F side of lockup but did not walk past any of the cells. He did not actually locate Jaqaris until 2252 hours—1 hour and 56 minutes after his last verified security round.

71. Jail video reviewed by investigators documented Jaqaris's final moments. According to Lieutenant Hirst's June 18, 2025 report, the video shows that at 2154 hours, Jaqaris's hand and arm appear to be moving outside the bars of his cell. At 2156 hours, his arm appears to stop moving. Had Albertorio-Ruiz conducted the rounds he was assigned—and the rounds he later falsely claimed to have conducted—Jaqaris could have been discovered still alive and rescued or stopped in his attempt entirely.

72. John Rock, a jail death investigator for the Virginia Board of Local and Regional Jails, separately determined that, although Albertorio-Ruiz had logged a security round at 2210 hours, "Deputy Ruiz did not walk by any cells." Chief Deputy Colonel Shonda Whitfield likewise confirmed that the last verifiable security check by Albertorio-Ruiz prior to his discovery of Jaqaris hanging was at 2056 hours.

14

73. Defendant Hogge's assurance to Ms. Bailey that deputies were checking on Jaqaris every 15 minutes was untrue. According to Chief Deputy Whitfield, at the time of his death, Jaqaris was not on 15-minute checks at all.

74. When EMS arrived at approximately 11:01 p.m., they were advised by deputies that Jaqaris hanged himself using a bedsheet and "had an unknown down time." They found Jaqaris with no pulse and not breathing.

75. Jaqaris was transported to Riverside Regional Medical Center where he was pronounced deceased at 11:42 p.m.

76. The Commonwealth of Virginia Office of the Chief Medical Examiner ("OCME") determined the cause of death to be "HANGING," and deemed the manner of death as "SUICIDE."

77. Reflective of the Defendants' failure to surveil or watch Jaqaris, the OCME Report of Investigation ("Report") lists "UNKNOWN" for the last time that Jaqaris was "LAST KNOWN ALIVE."

78. The actions of the Defendants described above manifested a reckless disregard for Jaqaris and his health and safety. Each Defendant acted with reckless or callous indifference to Jaqaris's dignity as a human being.

79. As a direct and proximate result of the acts and omissions of the Defendants, Jaqaris suffered extreme distress, agitation, anxiety, depression, pain, and suffering, then loss of consciousness, and, finally, death.

**Defendants' Duties**

80. At all times during Jaqaris's detention at the Jail, it was the duty of Sheriff Morgan and his deputies, employees, and/or agents (including, but not limited to, Deputies Albertorio-

15

Ruiz, Hogge, Peterson, Carlson, and Deputies 1-5), to exercise reasonable and acceptable measures to secure the health and safety of Jaqaris.

81.     At all times during Jaqaris's detention at the Jail, it was the duty of Sheriff Morgan and his deputies, employees, and/or agents (including, but not limited to, Deputies Albertorio-Ruiz, Hogge, Peterson, Carlson, and Deputies 1-5), to exercise reasonable care in providing medical (including psychiatric and psychological) care and professional services to Jaqaris and/or access to such care and services.

**Defendants Breached Their Duties**

82.     Notwithstanding the duties hereinabove described, each of the Defendants, individually and/or through their agents and employees, breached the duties that they owed to Jaqaris, and were deliberately indifferent and/or grossly negligent in their care and treatment of him.

83.     The deliberately indifferent and/or grossly negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a.     Failed to monitor the security video near Jaqaris's cell;

b.     Failed to implement adequate protocols in response to Jaqaris's clear suicidal danger and/or threats;

c.     Failed to convey to medical staff important information about Jaqaris's mental status and health;

d.     Failed to obtain medical, mental health, and psychiatric assistance for Jaqaris;

e.     Failed to monitor Jaqaris adequately;

16

f.      Failed to conduct timely rounds;

g.      Failed to remove garments and bedsheets from Jaqaris's cell;

h.      Failed to put Jaqaris in a safe cell;

i.      Failed to keep Jaqaris on suicide precautions/watch;

j.      Failed to respond to Shakia Bailey's expressed concerns;

k.      Falsely assured Ms. Bailey that Jaqaris would be immediately checked on and that the watch commander would be promptly told of the situation;

l.      Failed to implement infrastructure, policies, and training to ensure that detainees with clear suicidal ideations are adequately monitored; and

m.      Failed to otherwise attend to Jaqaris's serious mental health needs.

## COUNTS[3]

## COUNT I – GROSS NEGLIGENCE

### (Against All Defendants)

83.     Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

84.     Jaqaris was of unsound mind at the time he took his own life. As alleged herein, Jaqaris suffered from a serious mental illness, including acute psychosis, suicidal ideation, and auditory hallucinations, and was incapable of forming the rational intent required to bar recovery under Virginia law. Jaqaris's suicide was the foreseeable result of the Defendants' acts and omissions described herein. His mental state at the time of his death was caused, or in the

---

[3] All counts are brought pursuant to Virginia's wrongful death statute, Virginia Code § 8.01-50 *et seq.*, or in the alternative, Virginia's survival statute, Virginia Code § 8.01-25 *et seq.*

17

alternative aggravated, by the conditions of his confinement, including but not limited to his placement in segregated housing ("the hole"), his isolation from his family and other sources of support, the failure to provide him with psychiatric medication or treatment despite his documented acute psychosis and suicidal ideation, his removal from suicide watch despite continued symptoms, the bullying and threats by other detainees, and the Defendants' failure to respond to his deteriorating condition and to his mother's emergency call on the night of his death.

85.     The Defendants had, as discussed above, duties to Jaqaris that they breached.

86.     The Defendants were grossly negligent in that their actions and inactions, described throughout this Complaint, showed such a level of indifference to Jaqaris so as to constitute an utter disregard of prudence, amounting to a complete neglect for Jaqaris's safety. The Defendants knew of the very risk that materialized—Jaqaris's suicide—and failed to take even the most basic steps to prevent it: placing him in a camera-monitored cell, issuing him a suicide prevention smock, removing his bedsheet, increasing his monitoring, conducting rounds, responding to his mother's emergency call, and ensuring the watch commander received notice. Additionally, as to each individual Defendant, his or her several and successive acts and omissions, when considered together, had the cumulative effect of demonstrating an utter disregard for Jaqaris's safety.

a.     As to Defendant Albertorio-Ruiz, his failure to conduct any verified security round between 2056 and 2210 hours, his failure to walk past any cell when he purported to conduct a round at 2210 hours, his initial refusal to respond to detainees' cries for help for Jaqaris as he was hanging, his statement that he would respond after finishing his current task, and his subsequent false statements regarding his conduct, together demonstrate gross negligence.

18

b.      As to Defendant Hogge, her receipt of Ms. Bailey's emergency call, her assurance that the watch commander would be notified and that Jaqaris would be safe, her failure to actually notify the watch commander, her decision instead to leave a sticky note on a printer, and her false assurance that Jaqaris was being checked every 15 minutes together demonstrate gross negligence.

c.      As to Defendant Peterson, her receipt of the sticky note, her statement that she would inform Lieutenant Carlson, and her failure to take any action to ensure Jaqaris was checked on or that the watch commander acted, together demonstrate gross negligence.

d.      As to Defendant Carlson, her role as the on-duty watch commander, her failure to respond to or act on Ms. Bailey's emergency report after it was conveyed to booking, and her failure to supervise the deputies assigned to the hole or to ensure security rounds were performed, together demonstrate gross negligence.

e.      As to John Doe Deputies 1-5, their failure to conduct or supervise rounds, their failure to respond to detainees' cries for help, and their failure to take any action in response to Jaqaris's known suicide risk, together demonstrate gross negligence.

87.     The foregoing Defendants, at all relevant times, were acting within the scope of their employment as deputies, employees, and/or agents of Sheriff Morgan and the Newport News Sheriff's Office, but their conduct rose well above simple negligence and amounted to gross negligence such that no immunity attaches.

88.     As a direct and proximate result of the Defendants' gross negligence, Jaqaris suffered pain, physical and mental injury, and death.

19

89. As a direct and proximate result of the Defendants' gross negligence, the Estate of Jaqaris A. Jemison sustained damages pursuant to Virginia Code § 8.01-52, including but not limited to: (a) sorrow, mental anguish, and solace, including society, companionship, comfort, guidance, kindly offices, and advice of the decedent; (b) compensation for the reasonably expected loss of income of the decedent and services, protection, care, and assistance provided by the decedent; (c) expenses for the care, treatment, and hospitalization of the decedent incident to the injury resulting in death; and (d) reasonable funeral expenses.

90. The Defendants' gross negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT II – WILLFUL AND WANTON NEGLIGENCE

### (Against All Defendants)

91. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

92. Jaqaris was of unsound mind at the time he took his own life, for the reasons stated above.

93. The Defendants had, as discussed above, duties to Jaqaris that they breached.

94. The Defendants were willfully and wantonly negligent in that they acted, or failed to act, in the manner described throughout this Complaint, in conscious disregard of Jaqaris's rights and safety. The Defendants were on actual notice that Jaqaris was suicidal: he had been flagged as a high-risk inmate, placed on suicide watch, was known to be hearing voices and exhibiting signs of acute psychosis, was held in segregated housing, and his mother called the Jail

20

on the night of his death to report that Jaqaris was in immediate danger and needed to be checked on. Despite this actual knowledge, no Defendant took action to protect him.

95.     The Defendants acted, or failed to act, in the manner described throughout this Complaint, with reckless indifference to the consequences to Jaqaris when they were aware, from their knowledge of existing circumstances and conditions, that their conduct would in all probability result in Jaqaris's death.

96.     As a direct and proximate result of the Defendants' willful and wanton negligence, Jaqaris suffered pain, physical and mental injury, and death.

97.     As a direct and proximate result of the Defendants' willful and wanton negligence, the Estate of Jaqaris A. Jemison sustained damages pursuant to Virginia Code § 8.01-52, including but not limited to: (a) sorrow, mental anguish, and solace, including society, companionship, comfort, guidance, kindly offices, and advice of the decedent; (b) compensation for the reasonably expected loss of income of the decedent and services, protection, care, and assistance provided by the decedent; (c) expenses for the care, treatment, and hospitalization of the decedent incident to the injury resulting in death; and (d) reasonable funeral expenses.

98.     The Defendants' willful and wanton negligence establishes causes of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

99.     The Defendants' willful or wanton conduct entitles Plaintiff to punitive damages as well.

### COUNT III – 42 U.S.C. § 1983

### Failure to Protect — Fourteenth Amendment

### (Against All Defendants)

21

100.    Plaintiff incorporates the foregoing paragraphs of the Complaint as if fully set forth herein.

101.    At all times relevant to this Complaint, Defendants Albertorio-Ruiz, Hogge, Peterson, Carlson, and Deputies 1-5 acted under color of state law within the meaning of 42 U.S.C. § 1983.

102.    The Fourteenth Amendment requires that officials protect pretrial detainees from substantial risks of harm, including the risk of self-harm and suicide.

103.    Jaqaris's serious mental illness—including acute psychosis, suicidal ideation, and auditory hallucinations, and his documented prior attempts at self-harm and suicide—constituted a *serious medical need* triggering the constitutional duty of care. His risk of self-harm and suicide was not merely foreseeable; it was *known*. Jail records flagged him as a "High Risk Inmate" with "REPORTED RECENT HISTORY OF SUICIDAL AND HOMICIDAL IDEATION," he was placed on suicide watch, he was diagnosed with acute psychosis and suicidal ideation at the emergency room immediately before his transfer to the Jail, and his mother telephoned the Jail on the night of his death to report that Jaqaris was in immediate danger.

104.    The Defendants had actual knowledge of a substantial risk that Jaqaris would harm himself. They nevertheless failed to: place him in a safe cell or on renewed suicide watch after his deteriorating condition became apparent; remove the bedsheet and other items that could be used for self-harm; conduct timely rounds; respond to Ms. Bailey's emergency call in any meaningful way; or respond promptly to detainees' cries for help. These failures constitute deliberate indifference to a known and substantial risk of serious harm.

105.    As a direct and proximate result of Defendants' deliberate indifference to the known risk of self-harm, Jaqaris suffered extraordinary mental anguish and terror, physical pain, and death.

106.    Defendants' actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Jaqaris's constitutional rights, by reason of which Plaintiff is entitled to recover punitive damages.

107.    Defendants' violations of the Fourteenth Amendment to the U.S. Constitution establish causes of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages, punitive damages, and costs (including, pursuant to 42 U.S.C. § 1988, attorneys' fees) to the Estate.

*        *        *

WHEREFORE, Plaintiff Shakia L. Bailey, Administrator of the Estate of Jaqaris A. Jemison, Deceased, demands judgment against the Defendants, jointly and severally, as follows: (a) compensatory damages in the amount of Seventeen Million Dollars ($17,000,000), or such greater amount as may be proven at trial, on Counts I, II, and III, and, in the alternative, on Count IV; (b) punitive damages in the amount of Three Million Dollars ($3,000,000), or such greater amount as may be proven at trial, on Count III pursuant to 42 U.S.C. § 1983; (c) punitive damages in the amount of Three Hundred Fifty Thousand Dollars ($350,000) on Count II, or in the alternative on Count IV, pursuant to Virginia Code § 8.01-38.1; (d) reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 in connection with the federal civil rights claim; (e) costs of suit; and (f) pre-judgment and post-judgment interest, together with such other and further relief as the Court deems just and proper.

23

**TRIAL BY JURY IS DEMANDED.**

SHAKIA L. BAILEY, ADMINISTRATOR OF
THE ESTATE OF JAQARIS A. JEMISON,
DECEASED


By:    /s/ Mark J. Krudys

　　　　Counsel

Mark J. Krudys (VSB# 30718)
Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
Truist Place
919 East Main Street, Suite 2020
Richmond, Virginia 23219
804.774.7950 Main
804.381.4458 Facsimile
mkrudys@krudys.com; dzemel@krudys.com

*Counsel for Plaintiff Shakia L. Bailey, Administrator of the Estate of Jaqaris A. Jemison, Deceased*

24